Momoko **MUNSON**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 90–3888C.

United States Court of Federal Claims.

March 24, 1994.

---

Judith R. Forman, Los Angeles, CA, attorney for plaintiff.

Deborah A. Bynum, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant. Capt. Timothy J. Saviano, U.S. Army Litigation Center, of counsel.

## OPINION

MEROW, Judge.

This military pay case is before the court on cross motions for summary judgment. Plaintiff contests the action of the United States Army Finance and Accounting Center (the "Army" or "AFAC") in terminating her

Survivor Benefit Plan ("SBP")[1] payments, on the asserted basis that she is not the surviving spouse beneficiary, as required by law, to receive the benefits.

## FACTS

Lieutenant Colonel (LTC) Thomas V. Munson was married to Evelyn B. Porch (Evelyn Munson) on September 4, 1939, in Oklahoma, U.S.A. On October 1, 1962, LTC Munson retired from the Army with over twenty years of service. He was eligible to receive monthly retirement pay and elected not to participate in the Uniformed Services Contingency Option Act Program.[2]

On March 26, 1963, LTC Munson issued a power of attorney to F.G. Lopez Castro or Fernando Flores for the purpose of initiating divorce proceedings (against Evelyn) in Mexico.[3] Evelyn Munson was served notice of the divorce proceedings against her on June 24, 1963, in Mineral Wells, Texas. On July 22, 1963, the divorce was adjudicated.[4] There were no children born to this marriage. At the time of the divorce, LTC Munson was living in Japan and Evelyn Munson was living in Texas. LTC Munson and Momoko Ohmi (Momoko Munson) were married on August 8, 1963, by Vice Consul Robert D. Westfall at the American Embassy in Tokyo, Japan.

In September 1972, Congress enacted the Survivor Benefit Plan (SBP) in which former retirees were permitted to participate. On March 22, 1973, within the allotted time permitted by statute,[5] LTC Munson elected to participate in the SBP and named Momoko Munson as his spouse and two children as his step-sons and one child, Paul, as his son on the SBP Election Certificate.[6] By electing to participate, LTC Munson agreed to a reduction in his monthly retirement benefit payments during his lifetime in order to have an annuity paid to his eligible spouse and children after his death. The deductions were taken from his retirement pay until his death on February 9, 1983. The AFAC began the monthly annuity to Momoko, the named eligible spouse, in February 1983. Momoko continued to receive payments until approximately October 20, 1987, when she was notified that AFAC suspended her annuity until further determination of her marital status to LTC Munson could be ascertained.

On November 13, 1986, the Army had sent an inquiry to Momoko Munson from the Retirement Services Branch at Fort Sill, Oklahoma. In this correspondence, the Army requested a copy of the divorce decree to ascertain Evelyn Munson's former spouse status in order to issue her an ID card under the Former Spouse Protection Act.[7] On September 25, 1987, Evelyn Munson sent

---

1. Act of Sept. 21, 1972, Pub.L. No. 92–425, subch. II, § 1(3), 86 Stat. 706 (1972) (codified as amended at 10 U.S.C. §§ 1447–1455 (1988)).

2. Uniformed Services Contingency Option Act of 1953, ch. 393, 67 Stat. 501 (codified as amended at 10 U.S.C. §§ 1431–1444 (1988)).

3. It is not clear from the record exactly what the nature of the relationship was between LTC Munson and Evelyn Munson from 1939 until 1963. In the English version of the subsequent divorce decree, the grounds for divorce are stated as "abandoned [sic] of the conyugal [sic] domicile by part of the defendant [Evelyn] without a justify [sic] cause." Evelyn, however, asserted in a letter dated September 25, 1987, that LTC Munson deserted her (at an unspecified date) and that she only found out about the divorce in November 1986.

4. On July 23, 1963, the Vice Consul of the United States affixed his seal attesting to the authority of the Mexican judge. The Consulate's seal did not validate the contents of the decree or its accep-

tance by any of the states in the United States. Furthermore, the Mexican decree stated that "the properties will be made according to their Laws" (as was presented in the "demand" or petition for divorce). At the time of the divorce, the SBP had not been enacted and, therefore, it was not subject to any property division between LTC Munson and Evelyn.

5. Pub.L. No. 92–425 § 3, 86 Stat. 706, 711 (codified at 10 U.S.C. § 1455(b)), gave retirees the option to enroll in the SBP within one year of the effective date—September 21, 1972—of the Act.

6. At the time of election, LTC Munson, Momoko, and the three children were residing at plaintiff's current residence in Hacienda Heights, California.

7. Uniformed Services Former Spouses' Protection Act, Pub.L. No. 97–252, § 1004(a), 96 Stat. 730, 737 (Sept. 8, 1982) (amending 10 U.S.C. § 1072 (1988)) (originally enacted as Pub.L. No. 85–861, § 1(25)(B), 72 Stat. 1446 (Sept. 2, 1958)).

correspondence to the AFAC in Indianapolis, Indiana which indicated that she had been married to LTC Munson, but that he deserted her. Evelyn Munson alleged that she did not know about the Mexican divorce until November 1986, that she had been told that it was not legal, and she inquired as to whether LTC Munson had enrolled in the SBP. She also inquired as to whether she was the proper eligible spouse under the SBP and what actions were necessary to implement her benefits. To her letter Evelyn Munson attached a copy of the Mexican divorce decree with the English translation.

On October 20, 1987, E.L. Howard of AFAC sent correspondence to Momoko Munson regarding the allegation of the invalidity of her marriage to LTC Munson. He notified her that the SBP annuity she had been receiving since 1983 was suspended pending receipt of additional documentation verifying that LTC Munson's first marriage was indeed legally terminated and thus, his marriage to Momoko Munson legal, whereupon the annuity would be reinstated. AFAC did not convene any type of pre-termination hearing before suspending payment of Momoko Munson's benefits. Momoko Munson responded by letter dated November 30, 1987, in which she stated that she is the intended and eligible beneficiary and inquired into the source of the Army's information regarding any impropriety or defect in LTC Munson's divorce from Evelyn Munson. In part, her letter reads:

> I would like to know under what authority (Is there a law?) you are taking this action to deprive me of my sole means of support. Also I would like to know what type of information you have which would suggest any impropriety or defect regarding my late husband's divorce. Finally, I would like to know who or what gave this information to you.

> As far as I know and as far as I am concerned, my marriage to Thomas V. Munson was legitimate at all times. I have plenty of documents which will prove that. I feel that I am entitled to some kind of explanation for the actions that you are taking. I cannot believe that the Army which my late husband loyally

served for over twenty-six years through two wars would act against his wishes and deprive his widow of her sole means of support.

AFAC responded to Momoko Munson's letter on January 22, 1988, stating that she must show that LTC Munson and Evelyn Munson were divorced "in a court of competent jurisdiction in the United States or that the Mexican divorce was recognized and accorded full faith and credit by a U.S. court" in order to be eligible to again receive the SBP annuity. Again on May 18, 1988, AFAC contacted Momoko Munson regarding $1,202.00 of the amount of annuity payments she had received through October 1987, indicating that she must repay amounts received subsequent to her alleged ineligible status. At this point, Momoko Munson had been paid some $66,541.64 under the SBP annuity, and defendant has counterclaimed to recover this sum.

On October 25, 1990, Momoko Munson filed the complaint in this matter seeking a judgment for the SBP annuity amounts withheld since 1987. A stay of proceedings was previously granted in order to allow plaintiff to procure a declaratory judgment from a California court regarding the Mexican divorce terminating LTC Munson's marriage to Evelyn Munson, and the validity of his subsequent marriage to Momoko Munson. The effort to obtain a declaratory judgment apparently was thwarted by California's lack of jurisdiction over Evelyn Munson. Defendant then filed its motion for summary judgment to which plaintiff responded and additionally filed its cross motion for summary judgment.

## DISCUSSION

### A. THE VALIDITY OF THE TERMINATION OF PAYMENTS

In determining the validity of the Army's 1987 action in terminating the SBP annuity payments to Momoko Munson, it is important to emphasize what is not at issue. This is not a case where there is a viable contest between two parties for the same SBP annuity payments in which the Army would be, in essence, a stakeholder. It is conceded that Evelyn Munson has no entitlement to the

SBP annuity payments at issue. She was not designated to receive the benefits, there was no obligation that she be notified as to these benefits and, in any event, any SBP benefit claim by Evelyn Munson was not timely asserted. *Hart v. United States*, 910 F.2d 815 (Fed.Cir.1990); *Passaro v. United States*, 774 F.2d 456 (Fed.Cir.1985), *cert. denied*, 476 U.S. 1114, 106 S.Ct. 1969, 90 L.Ed.2d 653 (1986).

Moreover, there is no indication whatsoever that the relationship between LTC Munson and Momoko Munson was contrived in any way simply in order to obtain SBP annuity benefits for Momoko Munson. The Army was aware that the marriage relationship was of long standing. LTC Munson elected to take a reduced retirement in 1973 in order to provide for his designated spouse (Momoko Munson) and their child. His death occurred in 1983, some 20 years after the Toyko, Japan marriage ceremony in 1963.

■ In these circumstances, the issue that must be resolved is the validity of the Army's action in raising an issue as to the validity of a marriage and terminating a SBP annuity being paid to an expressly designated spouse beneficiary of long standing in the absence of any pre-termination evidentiary hearing, and in the absence of any viable claim by another party to the same benefit.

■ It is concluded that the Army's benefit termination action in this matter cannot be sustained under the principles established in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Where the Army's action casts doubt on the validity of a long-term marriage, deprives a designated beneficiary of the means of support planned by the deceased service member, and also impacts upon issue of the marriage, an evidentiary hearing is required before an SBP annuity may be terminated.

Defendant attempts to distinguish *Goldberg* from the facts in this case based on the Supreme Court's characterization of welfare benefits as a statutory entitlement, the suspension of which might deprive a recipient of sole means of support while waiting for a final determination of eligibility to continue to receive those very benefits. The defendant asserts that the annuity benefits paid through the SBP are different in nature from welfare benefits because: 1) they are not based on need and; 2) potential alternate sources of income are available to Momoko Munson whereas they are not available to welfare recipients. Although defendant has made these assertions, no evidence is presented characterizing the SBP as a benefit not based on need.

The legislative history of the SBP clearly expresses Congressional intent to provide "a reasonable level of income maintenance for the military survivor throughout her lifetime, ... during the gap years before age 62—when she now often receives nothing." S.Rep. No. 1089, 92nd Cong., 2d Sess. —— (1972), *reprinted in* 1972 U.S.C.C.A.N. 3288, 3307; *see Barber v. United States*, 230 Ct.Cl. 287, 294, 676 F.2d 651, 656 (1982) (stating that, prior to enacting SBP, many widows of retired servicemen were left without any income during gap years until Social Security became effective). In fact, Congress referred to a comparative analysis of the poverty line for a single aged person as stated by the Office of Economic Opportunity Economic Guidelines [8] when determining what level of payment a survivor would receive under the SBP. "The Committee is aware that the *$2,100 per year guaranteed annual income for widows of retirees would provide only for the basic needs of the widows involved.*" S.Rep. No. 1089, 92nd Cong., 2d Sess. —— (1972), *reprinted in* 1972 U.S.C.C.A.N. at 3310 (emphasis added). Momoko Munson was born on March 3, 1928, and was not yet 62 when she first received the SBP annuity or when AFAC terminated it in October 1987. Clearly, plaintiff falls into the category of military survivors whose needs Congress intended to meet and protect by enacting the SBP.

---

8. These guidelines were apparently developed by a Federal Interdepartmental Study Group which set $1,800 per year as the poverty line for a single aged person. They also reported that in the District of Columbia maximum payments to welfare recipients receiving old age assistance were about $1,900. S.Rep. No. 1089, 92nd Cong., 2d Sess., —— (1972), *reprinted in* 1972 U.S.C.C.A.N. at 3310.

Furthermore, the *Goldberg* case refers to a temporary suspension of benefits until a final determination of the recipient's status was to be ascertained at a later date. *See Goldberg,* 397 U.S. at 257–60, 90 S.Ct. at 1014–16. In the instant case, it is not evident from any of the correspondence or internal memos that the suspension of the annuity in October 1987 was temporary. In fact, in the letter dated January 22, 1988, AFAC informed Momoko Munson that she would not be considered the legal beneficiary and would have to repay all money received through October 1987. Again, in the letter dated May 18, 1988, AFAC actually computed the amount of money [$66,541.64, as amended in Defendant's Answer and Counterclaim filed February 6, 1992] that Momoko Munson allegedly owed to the government due to her alleged ineligibility to receive the annuity. In neither of these letters did AFAC include an explanation of the basis for the decision to suspend benefits even after Momoko Munson specifically requested, in writing, that AFAC provide to her the authority under which they acted. It is well established that "the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' [citations omitted] ... [t]o ensur[e] an effective 'initial check against mistaken decisions' is provided before the deprivation occurs, and a prompt opportunity for complete administrative and judicial review is available." *Brock v. Roadway Express, Inc.,* 481 U.S. 252, 261–62, 107 S.Ct. 1740, 1747, 95 L.Ed.2d 239 (1987) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 545, 105 S.Ct. 1487, 1493, 1495, 84 L.Ed.2d 494 (1985); *Bd. of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); and *Mathews v. Eldridge,* 424 U.S. 319, 349, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976)); *see United States v. James Daniel Good Real Property,* —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993).

Defendant asserts that "there is less reason here, than in *Goldberg,* to require an evidentiary hearing prior to adverse administrative action" and that "[i]t is only in settings where important decisions turn on questions of fact that due process requires an opportunity to confront and cross-examine adverse witness" (citations omitted). However, in the absence of a viable claim by another person to the same benefit, casting doubt on the validity of a long-term marriage and the deprivation of support benefits to a military retiree's widow are important decisions. " 'Against the justified desire to protect public funds must be weighed the individual's overpowering need in this unique situation not to be wrongfully deprived of assistance....' " *Goldberg,* 397 U.S. at 261, 90 S.Ct. at 1017 (citing *Kelly v. Wyman,* 294 F.Supp. 893, 901 (1968), where court rejected argument that protecting public fisc did not meet standard of "overwhelming consideration" necessary to justify terminating funds to destitute recipients without prior hearing).[9] This court's predecessor has stated that "[s]ince the pioneer's ax first rang in the wilderness of America the honoring of real obligations has been a tradition of her people. So long as we respect this tradition, the recognition of a just debt will be esteemed a privilege and its payment a matter of pride." *Norcross v. United States,* 142 Ct.Cl. 763, 767, 1958 WL 7367 (1958). Moreover, in taking action which impacts family values, such as questioning the validity of a marriage or terminating support payments to a designated surviving spouse, it must be remembered that:

> The law is not an end in itself, it is a means to an end. It is a vehicle for reaching the ends of justice. Experienced nations and civilized people have found that if the proper results are to be reached there must be reasonable interpretation of the laws. The courts always hesitate to apply a stern lettering when it runs counter to the whole stream of human experience and reaches a conclusion that no reasonable person would wish.
>
> *Such sources of security, whether private or public, are no longer regarded as luxuries or gratuities; to the recipients they are essentials,* fully deserved, and in no sense a form of charity.' " *Goldberg,* 397 U.S. at 262 n. 8, 90 S.Ct. at 1017 n. 8 (emphasis added).

9. The *Goldberg* court mentioned various types of property rights: " '[s]ociety today is built around entitlement.... [T]he worker [has] his union membership, contract, and pension rights, the executive his contract and stock options; all are devices to aid security and independence....

*Sonnabend v. United States,* 146 Ct.Cl. 622, 628, 175 F.Supp. 150, 153 (1959) (Jones, C.J.) (civil service annuity).

Clearly, plaintiff was entitled to an evidentiary hearing before the Army determined not to honor the election of a deceased service member and to cast doubt on the validity of a marriage of some 20 years duration. There is no mention of falsification of documents or fraud in the inducement as an instigating factor for AFAC's need to act in the immediacy to prevent abuse of the SBP. *See In re Estate of Baker,* 48 Misc.2d 732, 265 N.Y.S.2d 816 (1965) (holding that United States could recover benefits paid out based on false representations by a wife that she had terminated a purported marriage to another man). Thus, in the undisputed factual circumstance presented in this case, the Army's 1987 benefit termination action is invalid and plaintiff is entitled to all withheld payments.

## B. *THE VALIDITY OF THE MARRIAGE*

Even if it is assumed, arguendo, that a pre-termination hearing was not required, plaintiff is still entitled to the SBP annuity at issue. The SBP provision sets forth two instances where a widow is eligible for such payment:

The term "widow" means the surviving wife of a person who, if not married to the person at the time he became eligible for retired or retainer pay-

(A) was married to him for at least one year immediately before his death; or

(B) is the mother of issue by that marriage.

10 U.S.C. § 1447(3) (1988).

■ It is established that state law is applicable to determine marital status. *Yarbrough v. United States,* 169 Ct.Cl. 589, 341 F.2d 621 (1965). The Supreme Court has determined that " '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.' " *See Rose v. Rose,* 481 U.S. 619, 625, 107 S.Ct. 2029, 2033, 95 L.Ed.2d 599 (1987) (quoting *In re Burrus,* 136 U.S. 586, 593–94, 10 S.Ct. 850, 853, 34 L.Ed. 500 (1890)); *see also McCarty v. McCarty,* 453 U.S. 210, 220, 101 S.Ct. 2728, 2735, 69 L.Ed.2d 589 (1981) (quoting *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979) reiterating that "[s]tate family and family-property law must do 'major damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that state law be overridden"). Absent any argument that some other state's law might apply in this matter, California state law will be applied.[10]

■ According to California law, when a second marriage exists, it is presumed that a first marriage has been terminated and is no longer in effect. Cal.Evid.Code, §§ 604,[11] 606,[12] and 663[13]. Therefore, the govern-

---

**10.** Defendant has not challenged, indeed readily admits, that state law applies to determine the validity of marriages and divorce decrees. Plaintiff has asserted that California state law is applicable because LTC Munson and Momoko Munson were residing in California when the Survivor Benefits Plan was enacted and when LTC Munson's rights to elect Momoko Munson as his beneficiary under the Plan arose. Defendant has not proposed the application of any particular state's law and does not here contest the application of California law.

**11.** Section 604 of the California Evidence Code States:

§ 604. **Effect of presumption affecting burden of producing evidence**

The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact

shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate.

West's Ann.Cal.Evid.Code. § 604 (West 1966 & Supp.1994) (Stats.1965, c. 299, § 2.).

**12.** Section 606 of the California Evidence Code states:

§ 606. **Effect of presumption affecting burden of proof**

The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact.

West's Ann.Cal.Evid.Code § 606 (West 1966 & Supp.1994) (Stats.1965, c. 299, § 2.).

**13.** Section 663 of the California Evidence Code states:

ment's analysis and assertion that to recognize the second marriage of LTC Munson (to Momoko Munson) would permit a bigamous and illegal relationship is unsupported in California law. The government's position that "[i]t is axiomatic that a marriage entered into by two parties before the legal dissolution of an earlier marriage of one of the parties is prohibited" misses the relevant point. Under California law, the presumption of the validity of second marriages places the clear burden on the party contesting validity to negate the existence of any prior dissolution of the first marriage. This the Army has not done.

In order to challenge Momoko Munson's marriage, the Army must overcome the presumption that "in the case of a second marriage, that marriage, shown to have been entered into in accordance with the requirements of the jurisdiction where it took place, is a valid marriage." *Briggs v. United States*, 116 Ct.Cl. 638, 650, 90 F.Supp. 135 (1950) (applying California law which recognized laws of Great Britain to confirm that "the burden of showing its [subsequent marriage] invalidity is on the person asserting such invalidity, *Patterson v. Gaines*, [47 U.S. 550, 597],[14] 6 How. 550 [12 L.Ed. 553] (1847), and this is true even though that burden is one of proving the negative" (citations omitted)); *see also Hunter v. Hunter*, 111 Cal. 261, 267, 43 P. 756 (1896) (holding that "presumption in favor of innocence and the legality of the marriage between plaintiff and defendant should prevail; and the burden is with the party objecting to its validity to prove it is not valid"). Courts have further held:

> [I]n the absence of such negative proof that no divorce or annulment had been secured by the other party to the prior marriage, *the courts have held the presumption of the validity of a later marriage consummated by a formal ceremony, is superior to and controlling over the mere presumption that a prior marriage continued in force.*

*Briggs*, 116 Ct.Cl. at 653, 90 F.Supp. 135 (emphasis added) (citing *Moran v. Superior Court*, 38 Cal.App.2d 328, 100 P.2d 1096 (1940); *Ryder v. Ryder*, 2 Cal.App.2d 426, 37 P.2d 1069 (1934); *Hamburgh et al. v. Hys et al.*, 22 Cal.App.2d 508, 71 P.2d 301 (1937)).

As in the *Briggs* case, where "the defendant has made no attempt whatsoever to show that Perring did not procure a divorce or annulment and the presumption that he did so stands unassailed," *see Briggs*, 116 Ct.Cl. at 653, 90 F.Supp. 135, the same is true in the present case regarding the Army's burden of proof concerning any divorce or annulment procured by Evelyn Munson. In fact, as plaintiff asserts, Evelyn Munson had applied for benefits under the Former Spouse Act; she did not initially assert her right to the same "eligible spouse" benefits which Momoko Munson was receiving. Evelyn Munson apparently knew and believed that she was divorced from LTC Munson and, therefore, sought benefits accruing to a former spouse.

As the California Supreme Court explained in *Rediker v. Rediker*, 35 Cal.2d 796, 221 P.2d 1 (1950), "public policy of this state *requires* the preservation of the second marriage and the protection of the rights of the second spouse 'rather than a dubious attempt to resurrect the original marriage.'" *Rediker*, 35 Cal.2d at 808, 221 P.2d at 8 (emphasis added) (citations omitted). That court concluded that:

> "It can no longer be said that public policy requires nonrecognition of all irregular foreign divorces.... From a pragmatic viewpoint, judicial invalidation of irregular foreign divorces and attendant remarriages, years after both events, is a less than effective sanction against an institution

---

§ 663. **Ceremonial marriage.** A ceremonial marriage is presumed to be valid.
West's Ann.Cal.Evid.Code § 663 (West 1966 & Supp.1994) (Stats.1965, c. 299, § 2.) (including comments that this section "codifies a common law presumption recognized in the California cases").

14. The citation for *Patterson v. Gaines* in the Court of Claims case, *Briggs*, is to an unauthorized version (Curtis) of the U.S. Reports. Thus, "6 U.S. 813" as cited in *Briggs* is the same as "47 U.S. 550" cited herein.

whose charm lies in its immediate respectability."

*Rediker,* 35 Cal.2d at 808, 221 P.2d at 8 (quoting *Goodloe v. Hawk,* 113 F.2d 753, 757 (D.C.1940) (Vinson, J.)).

Accordingly, on the record submitted, the applicable California law supports the continued validity of Momoko Munson's marriage to LTC Munson from 1963 up to his death in 1983. Entitlement thus is established to the SBP annuity which LTC Munson specifically elected.[15]

### C. *SBP ANNUITY ELIGIBILITY PURSUANT TO SECTION 1447(3)(B)*

■ Under the SBP, the second way a widow may qualify as the eligible surviving spouse is by being the mother of issue by that marriage. 10 U.S.C. § 1447(3)(B). On his election form, LTC Munson listed Momoko Munson as his spouse and three children, two as step-sons and one, Paul, as his son. AFAC never addressed Momoko Munson's right to the SBP benefits as a mother of issue of that marriage.[16] Further, defendant chose not to address the arguments briefed by plaintiff regarding this issue. Although Paul's birth date, August 15, 1961, precedes his parents' date of marriage, August 8, 1963, the Supreme Court and California state courts have ruled that the subsequent marriage of parents of a child born out of wedlock eradicates any distinction with respect to children born of the marriage. *See Stevenson's Heirs v. Sullivant,* 18 U.S. (5 Wheat.) 207, 214, 5 L.Ed. 70 (1820) (stating that "as in cases that have arisen since the statute [regarding the bounty to be paid by the government to the widow or heir of a soldier as compensation for his death], the legitimate rights of the children, born before marriage, all take date from the marriage, without any reference to the time of recognition, or the death of the father"); *In re Estate of Lund,* 26 Cal.2d 472, 480, 159 P.2d 643, 648 (1945) (discussing Roman law allowing several methods of legitimation, including subsequent marriage by parents, as precedent for principle codified at California Civil Code § 215 [now Cal.Family Code § 7611][17]).

Thus, Paul is the issue of the marriage of LTC Munson and Momoko Munson. Given the presumption as to the validity of that marriage under California law and the lack of any other viable claimant for the same SBP annuity in this matter, it is concluded that Momoko Munson is thereby an eligible widow under section 1447(3)(B) of the SBP to receive annuity payments under section 1450(a).

### CONCLUSION

By this Opinion, filed unpublished on December 28, 1993, judgment on the issue of

---

**15.** The conclusion reached in *Shaff v. United States,* 695 F.2d 1138 (9th Cir.), *cert. denied,* 464 U.S. 821, 104 S.Ct. 85, 78 L.Ed.2d 94 (1983), on the validity of the marriages involved in that litigation is not applicable to the facts of the instant case where there is no person other than Momoko Munson who can be eligible for the SBP annuity; the marital relationship between Momoko and LTC Munson was of long standing; and Evelyn Munson knew or had reason to know of the prior divorce proceedings.

**16.** Reference to the letters or internal memoranda from AFAC demonstrates that apparently no one in AFAC ever checked for Momoko Munson's eligibility to receive SBP benefits for any reason other than the validity of the 1963 divorce.

**17.** California Civil Code § 7004, as cited for this proposition by plaintiff in her cross motion for summary judgment, was repealed by Ch. 219, A.B. No. 1500, sec. 63 (July 26, 1993). That same legislation, however, enacted California Family Code § 7611 which reads:

§ 7611. A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with Section 7540) of Part 2 [entitled "Presumption Concerning Child of Marriage and Blood Tests to Determine Paternity"] or in any of the following subdivisions:

\* \* \* \* \* \*

(c) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true:
  (1) With his consent, he is named as the child's father on the child's birth certificate.
  (2) He is obligated to support the child under a written voluntary promise or by court order.
(d) He receives the child into his home and openly holds out the child as his natural child. California Family Code, as amended at Ch. 219, A.B. No. 1500, sec. 176 (July 26, 1993).

liability was entered in favor of plaintiff and provision was made for further submissions by the parties to obtain agreement as to the monetary amount involved. Subsequent filings show agreement by the parties that the amount of plaintiff's SBP annuity remaining unpaid up to January 31, 1994 is $90,938.80. The parties also agree that the sum to be withheld from this $90,938.80 sum for federal income taxes is $17,937.21.

As the 1987 action terminating the SBP annuity payments to Momoko Munson is invalid, as California law supports the validity of the 1963 marriage between LTC Munson and Momoko Munson, and as Momoko Munson is, in any event, entitled to the SBP annuity payments expressly elected for her benefit by LTC Munson because she is the mother of issue by her marriage to him, it is **ORDERED:**

(1) Final Judgment in the amount of $90,-938.80 shall be entered in favor of plaintiff with $17,937.21 of this sum to be withheld for federal income tax, resulting in the net amount of $73,001.59 to be paid to plaintiff in satisfaction of defendant's SBP annuity liability to plaintiff for the period up to January 31, 1994;

(2) Defendant's Counterclaim is **DENIED;**

(3) To provide complete relief, and collateral to the entry of the final monetary judgment in this matter, appropriate records shall be corrected by the government to reflect plaintiff's continued entitlement to the SBP annuity payments elected for her by LTC Munson for such payments due and owing after January 31, 1994.