*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0043p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

      *v.*

NATALIE COKER,

        *Defendant-Appellant.*

No. 06-6504

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 05-00232—Robert L. Echols, District Judge.

Argued: October 26, 2007

Decided and Filed: January 24, 2008

Before: BOGGS; Chief Judge; KENNEDY, Circuit Judge; and JORDAN, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Richard J. Braun, BRAUN & CROTWELL, Nashville, Tennessee, for Appellant. Eli Richardson, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Richard J. Braun, BRAUN & CROTWELL, Nashville, Tennessee, for Appellant. Eli Richardson, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

BOGGS, Chief Judge. A grand jury indicted Natalie Coker on five counts of conspiring to defraud the United States, taking bribes, and violating the federal conflict of interest laws. Coker pleaded guilty to a single count of committing an illegal conflict of interest, in return for having the other charges dropped. The district judge sentenced her to forty-six months of imprisonment. Coker appeals, arguing that prosecutorial misconduct and incorrect guidelines calculations warrant vacating her sentence. We affirm because her various arguments are either waived, withdrawn, or meritless.

---

[*] The Honorable R. Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

I

Natalie Coker worked as the Assistant Director of the Veteran's Administration's Consolidated Mail Outpatient Pharmacy ("CMOP") in Murfreesboro, Tennessee. Her supervisor was Joseph Haymond. CMOP mailed subsidized prescription drugs to veterans. In 1999, Coker and Haymond, aided by several co-conspirators, began exploiting their public jobs for personal gain.

A

One co-conspirator, Michael Walsh, owned Industrial Supply Company. In 1999, he learned from a business associate, Dick Pruett, that CMOP was looking for someone to supply security tape at a lower price than the $18.50 per roll CMOP was paying 3M. Walsh found a vendor in New Jersey, CGM, willing to sell tape for $2.50 a roll.[1] After Haymond approved samples of the tape, Pruett arranged a meeting on August 19, 1999, between himself, Haymond, Coker, and Walsh to discuss the sale. At the meeting, Haymond told Walsh to sell the tape to CMOP for $6.51 per roll, pay Haymond and Coker each a kickback of $1 per roll, and keep the rest. Coker told Walsh to subdivide each order into smaller parts to circumvent official purchasing rules and facilitate the kickback.

Soon afterwards, Walsh began selling tape to the CMOP. He later raised his price to $6.90 to help cover the taxes he was paying on the sales. Coker and Haymond knew of, and did not object to, the price increase. Walsh testified that his usual markup was 30% and, absent the kickbacks, he would have sold the tape for between $3.40 and $3.50 a roll. Over the next 22 months, Walsh sold over 115,000 rolls of tape to CMOP, and paid Coker and Haymond over $115,000 each in kickbacks. The scheme ended in 2001 when the VA's regional purchasing department took over the tape purchases.

Walsh continued to sell other supplies to CMOP after the tape conspiracy ended. In early 2004, Haymond told Walsh that CMOP had sixteen extra pallets of six-by-nine mailer bags and asked if Walsh could sell them elsewhere. Walsh contacted Jay Cooper, Director of the Dallas CMOP. Walsh knew Cooper from previous deals, unrelated to CMOP, where Walsh had paid kickbacks to Cooper, and this time Walsh convinced Cooper to buy five of the pallets from CMOP. After the sale, Haymond sought his usual kickback, and told Walsh to pay Coker her cut immediately because she "needed the money." Coker's share was $3500. Coker then ordered Walsh to write, on Walsh's stationary, a letter explaining the sale that would help Coker justify the sale in case the CMOP was ever audited. Walsh complied. In fall 2005, Walsh began cooperating with the FBI's investigation into the CMOP and agreed to wear a wire during his conversations with Haymond and Coker.

Another co-conspirator, Michael Barrett, practiced law in Alabama until he was disbarred for, as he euphemistically put it, "using some client funds to pay bills." He then entered the consulting business with his partner Kevin Bowling. They founded EconoGenesys, which made money by helping other businesses win government contracts and then taking a commission on the contract. Around January 2002, another VA employee referred Coker and Haymond to Barrett for advice. Several months later, Barrett began connecting contractors with the CMOP. From 2000–03, about ninety percent of EconoGenesys's revenue came from placing clients with the CMOP. Coker and Haymond knew about the contracts, and they hired Barrett as a temporary employee of the CMOP from July to October 2002.

---

[1]The price difference reflects a quality difference. 3M's tape was "tamper evident" and Walsh initially told CGM that he wanted "tamper evident" tape, but the tape Walsh ended up buying and reselling to CMOP was not in fact "tamper evident."

Sometime during Barrett's temporary employment, Haymond and Coker gave Barrett a spreadsheet showing all the contracts that Barrett had set up with CMOP. They demanded that Barrett pay them half of his profits. Barrett protested that if he paid them half, he would end up losing money after taxes. Coker responded that the taxes were Barrett's problem, and that if he did not pay, he "would be out of the CMOP and she would tell everyone what a sorry bastard [he] was." The three of them met again several weeks later, and Barrett agreed to pay the kickbacks as demanded. Barrett began making payments and continued to do so until the end of 2003. He paid Haymond and Coker a combined total of between $60,000 and $90,000.

Around the time of Barrett's temporary work for CMOP, Coker and Haymond also asked Barrett to find a reliable company to repack, or prepack, prescription drugs into specific quantities and then ship the drugs to patients. When Barrett told his business partner Kevin Bowling of the request, Bowling suggested that Bowling's father-in-law Bob Allen might be interested in forming a company to handle the job. Barrett, Bowling, Allen, Coker, and Haymond met to discuss the details of the operation, and then Bowling, Allen, and two other minor investors formed PrePak Systems, Inc. ("PrePak") to handle the job. Coker helped PrePak with initial logistical and regulatory issues and wrote a formal letter to help PrePak obtain credit. PrePak received the contract in May 2003.

At the same time that Coker was advising PrePak's start-up operations and helping PrePak win the CMOP contract, Coker began to negotiate with PrePak for employment. These negotiations took place over e-mail between November 7 and November 15. The parties discussed extensively the terms of employment, but Coker ended up declining the offer because she did not want to move.

B

Coker and Haymond were arrested on November 29, 2005. Haymond killed himself the next day. A grand jury indicted Coker on December 28, 2005, and issued a superseding indictment on February 22, 2006. The superseding indictment charged Coker with one count of conspiring with Haymond and Walsh to defraud the United States, in violation of 18 U.S.C. § 371, three counts of bribery, in violation of 18 U.S.C. § 201(b)(2), and one count of having an illegal conflict of interest by negotiating for employment with PrePak when that company had official business before her as a government employee, in violation of 18 U.S.C. §§ 208(a) and 216(a)(2). On March 24, 2006, Coker pleaded guilty to the illegal conflict of interest count in return for having the other counts dropped.

The plea agreement stated that the maximum punishment was five years of imprisonment. It also contained two other paragraphs pertinent to this appeal. First, Coker explicitly waived her right to appeal her sentence for any reason other than involuntariness, ineffective assistance of counsel, prosecutorial misconduct, or an upward departure from the guidelines. Second, the plea stated that while the base offense level for her crime was 6 under U.S.S.G. § 2C1.3(a), no agreement between the parties existed as to "whether the cross-reference in U.S.S.G. § 2C1.3(c)(1) for an offense involving a bribe would apply as related conduct." The district court established that Coker acted knowingly and voluntarily when she signed her plea and that she knew the terms of the plea agreement.

The PSR estimated the total loss from Coker's corruption at $417,120. It reached this figure by multiplying 115,480, the number of rolls Walsh sold the CMOP, by the inflated price he charged to get $782,026, then by multiplying 115,480 by $3.45, the price for which the government said the tape could have been purchased elsewhere, to get $398,406, and finally by subtracting $398,406 from $782,026 to get $383,620. The PSR added $30,000 for Coker's kickbacks on contract commissions from Barrett and $3500 for Coker's kickback on the mailer bags from Walsh to reach a final loss amount of $417,120.

The sentencing hearing took place on October 13 and 16, 2006. The government introduced extensive testimony to prove Coker's kickbacks as "relevant conduct" for sentence enhancement purposes. The court accepted the facts in the PSR, found Coker's kickbacks to be relevant conduct, and therefore determined that her crime of conviction involved a bribe. Based on this conclusion, the court applied the cross-reference in U.S.S.G. § 2C1.3 (governing Coker's crime of conviction) to U.S.S.G. § 2C1.1. This boosted Coker's base offense level from 6 to 10. The court added two levels under U.S.S.G. § 2C1.1(b)(1) because more than one bribe occurred, and then added fourteen more levels under § 2C1.1(b)(2) because the amount of loss was between $400,000 and $1,000,000. The court then subtracted three levels for acceptance of responsibility to reach a final offense level of 23. Her guideline range was 46–57 months because her Criminal History Level was I. The court described Coker's culpability as "severe," but chose the lowest sentence within the guidelines, rather than the 57-month sentence the government requested, because of the court's analysis of the § 3553 factors and its mild discomfort with the government's decision to bring Coker's other conduct in "through the back door" of sentence enhancements.

Walsh pleaded guilty on March 23, 2006, the day before Coker pleaded guilty, to one count of conspiring to defraud the United States. His plea agreement listed a base offense level of 10 and an eight-level enhancement for a loss that exceeded $200,000. Although the agreement does not so state, Walsh testified that he was also cooperating with the government against Jay Cooper and was not going to be prosecuted for his payment of kickbacks to Cooper. Walsh's PSR recommended that Walsh receive only a two-year sentence because of his extensive cooperation.

Walsh's sentencing hearing took place on January 12, 2007. At the hearing, the government stipulated to a loss amount of $263,000, based on the estimated $120,000 in taxes that Walsh paid on his revenue from the tape sales. The government also asked the court to depart downward because of Walsh's substantial assistance to the government. The court did depart downward, and sentenced Walsh to three years of probation.

Coker now appeals her sentence. We have jurisdiction under 28 U.S.C. § 1291.

II

Coker asks us to vacate her sentence on grounds of prosecutorial misconduct, erroneous sentence calculations, and ineffective assistance of counsel. We consider only her prosecutorial misconduct claims on their merits; as will be explained later, she has waived her sentencing claim and withdrawn her ineffective assistance claim.

A

We usually review claims of prosecutorial misconduct *de novo*. *United States v. Green*, 305 F.3d 422, 429 (6th Cir. 2001). However, if the defendant did not raise the misconduct claim below, we review the record only for plain error. *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001). Proving plain error requires proving that: "(1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected the defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Emuegbunam*, 268 F.3d at 406. Coker did not raise her claim of prosecutorial misconduct below; therefore, we review only for plain error. We reject her appeal because we hold that no prosecutorial misconduct occurred, let alone misconduct sufficient to constitute plain error.

B

Coker complains about three incidents of misconduct. She argues that misconduct occurred when the government: 1) stipulated with Walsh to a lower loss than the government argued that she

was responsible for; 2) violated *Brady* by failing to disclose this stipulation; and 3) tried to prove the loss amount at the sentencing hearing in a manner inconsistent with the PSR.

Coker raises an unusual prosecutorial misconduct claim. Most claims of prosecutorial misconduct address the prosecutor's conduct at trial rather than at sentencing. *See, e.g.*, *United States v. Garcia-Meza*, 403 F.3d 364, 373 (6th Cir. 2005) (discussing and applying test for whether prosecutor's statements during closing argument constituted misconduct). The few misconduct claims addressing conduct at a sentencing hearing usually deal with the prosecutor's comments at the sentencing phase of a death penalty case, not the sentencing hearing in a run-of-the-mill fraud case. *See, e.g.*, *Bates v. Bell*, 402 F.3d 635, 649 (6th Cir. 2005) (discussing prosecutorial misconduct at death-penalty sentencing hearings).

The reason for Coker's novel prosecutorial misconduct claims is easily found. Her plea agreement waived her right to appeal any issues except prosecutorial misconduct, ineffective assistance, and an upward departure from the guidelines. She seeks to "dress up" her arguments "in the guise of 'prosecutorial misconduct' . . . in an effort to circumvent the waiver in he[r] plea agreement." *United States v. Cook*, 89 F. App'x 988, 1001 (6th Cir. 2004). Coker will not be permitted by artful pleading to evade the plain language in her plea agreement, so we will consider first whether each incident she identifies is a type that can ever constitute prosecutorial misconduct before we consider whether any misconduct occurred in her case.

Furthermore, we note that "not every error [by a prosecutor] amounts to misconduct." *United States v. Montgomery*, 990 F.2d 266, 271 (7th Cir. 1993). Coker must show prosecutorial *misconduct*, not merely some error by a prosecutor. Prosecutorial misconduct requires showing prejudice, *United States v. Layne*, 192 F.3d 556, 579 (6th Cir. 1999), so absent prejudice, Coker cannot prevail.

1.      Stipulation of Loss Amount

The government argued at Coker's sentencing hearing that the loss amount from Coker's kickbacks with the red tape was $383,000. Three months later, at Walsh's sentencing hearing, the government asked the district court to find that the loss amount for Walsh's involvement in the same scheme was $263,000. The lower amount reflected the estimated $120,000 in taxes that Walsh paid to the government on the $383,000 he made on the tape sales.

The taxes Walsh paid were factored into Walsh's loss amount because the guidelines state that the loss amount should be reduced by "[t]he money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 comment (n.2(E)(i)). Coker assumes that she is entitled to the same credit because she "acted jointly" with Walsh in committing the crime. She misreads the provision. It refers to those who act jointly to ameliorate the crime, not to commit it. Walsh paid taxes on his ill-gotten gains; Coker neither paid nor helped Walsh pay his taxes, and she cannot take advantage of the provision.

Coker argues that these "inconsistent" loss amounts between herself and Walsh constitute prosecutorial misconduct because one of the stipulations must be "inaccurate." *Cf. United States Attorneys' Manual* § 9–16.300 (prohibiting government attorneys from stipulating to a fact that is not accurate). The argument initially fails to recognize that two different loss amounts, for two different defendants, can both be accurate because the different loss amounts reflect the different loss for which each defendant was responsible.

Furthermore, the government's different loss calculations cannot be prosecutorial misconduct—let alone misconduct that rises to plain error—because the government has no obligation to stipulate to identical loss amounts with co-conspirators. *United States v. Pierce*, 409 F.3d 228, 233–34 (4th Cir. 2005) (holding loss stipulation of between $70,000 and $120,000 with

one defendant and between $120,000 and $200,000 with co-conspirator permissible in a mail fraud case). Our circuit has approved a government stipulation to a lower amount of drugs with one defendant in a drug conspiracy than the government attributed to another defendant who was convicted at trial. *McCoy v. United States*, No. 96-2384, 1998 WL 252762, at *2 (6th Cir. May 11, 1998). *McCoy* followed cases from other circuits that had held the doctrine of non-mutual collateral estoppel inapplicable in criminal cases. *Ibid.* (*citing United States v. Valdez-Soto*, 31 F.3d 1467, 1476 (9th Cir. 1994), and *United States v. Montes*, 976 F.2d 235, 239 (5th Cir. 1992)).

The prosecutor's decision to give Walsh a credit for the taxes he paid as "money returned to the victim" under U.S.S.G. § 2B1.1 comment (n.2(E)(i)) was not required by the Guidelines. Walsh's payment of taxes can be seen as Walsh covering his tracks and avoiding a tax fraud prosecution as easily as it can be seen as returning money to the victim. The reduction was more likely part of a deal between Walsh and the prosecution in return for Walsh's cooperation. But this does not help Coker, because while the provision is only arguably applicable to Walsh, it is clearly inapplicable to her. She returned nothing. Given this fact, and, more importantly, the clear irrelevance of non-mutual collateral estoppel in criminal cases, we hold that the government's decision to stipulate a different loss amount with Walsh than it argued for at Coker's sentencing hearing was not only not prosecutorial *mis*conduct, but was legitimate and acceptable prosecutorial conduct.

2.      Disclosure of Loss Amount

Coker next argues that the government violated *Brady* because the stipulation with Walsh was material to her sentencing but not provided to her.**[2]** The Supreme Court has held that in order to be a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Furthermore, the evidence must be "material to guilt or punishment" before nondisclosure warrants reversal. *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994). Evidence is material for *Brady* purposes only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995).

A threshold problem with Coker's *Brady* claim is that it may be barred by her guilty plea. Prior cases have explicitly declined to decide whether and to what extent a federal defendant who pleads guilty may raise a *Brady* claim. *United States v. Ross*, 245 F.3d 577, 583 (6th Cir. 2001); *see also United States v. Matthews*, 168 F.3d 1234, 1242 (11th Cir. 1999) (declining to decide whether guilty plea barred subsequent *Brady* claim because claim was meritless). We need not tackle this question in Coker's case because it is easier to assume that she may raise a *Brady* claim and then reject the claim. She appears to view three pieces of information as *Brady* material: 1) that Walsh paid taxes on his ill-gotten gains; 2) that the Guidelines might permit her to reduce the loss amount based on the taxes paid; and 3) the government's stipulation with Walsh to reduce his loss on based on the taxes he paid.

Coker knew about the information in 1) before her sentencing hearing. Walsh's plea agreement, which was disclosed to Coker, and which she specifically referenced at her sentencing

---

**[2]**One court of appeals has stated that "*Brady* violations do not constitute prosecutorial misconduct per se." *United States v. Vinyard*, 266 F.3d 320, 331 n.9 (4th Cir. 2001). The Supreme Court has since held that the "three essential elements of a *Brady* prosecutorial misconduct claim" are: 1) evidence favorable to the accused; 2) suppression of that evidence; and 3) prejudice. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). These are the three elements of *Brady* itself, *Brady v. Maryland*, 373 U.S. 83, 87–88 (1963), so we will assume that a *Brady* violation can be prosecutorial misconduct.

hearing, stated that Walsh "was having to pay taxes on the entire amount of revenue received from the CMOP." Furthermore, Walsh discussed taxes with Coker while the fraud was still ongoing, and later testified at Coker's sentencing hearing that he raised his price "approximately a year after the initial order because [he] was paying all the taxes." *Brady* does not apply "when the information is readily available to the defense from another source." *Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007). Here, Coker had access to the information about Walsh's tax payments from multiple other sources, and therefore this information is not covered by *Brady*.

The information in 2) is not *Brady* material because it is not a "fact," but a potential legal argument. *Brady* obligates the government to disclose "*evidence* favorable to the accused." *Brady*, 373 U.S. at 87 (emphasis added). It does not obligate the government to give the defendant legal theories. *Compare Hickman v. Taylor*, 329 U.S. 495, 516 (1947) ("[d]iscovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary.").

As to 3), the stipulation with Walsh, Coker cannot even prove that the agreement existed at the time of her sentencing hearing. Walsh's plea agreement, signed before both Coker's and Walsh's sentencing hearing, stipulates that the loss amount for Walsh's crime was between $200,000 and $400,000. No specific figure is given. Coker points to Walsh's counsel's comments at Walsh's sentencing hearing as evidence that Walsh and the government had an unwritten agreement that they failed to disclose, but the statements only indicate a general agreement and not a specific figure. Walsh's final loss amount was $263,000, a figure consistent with his plea agreement. Absent a specific figure that contradicts the plea agreement, there is no proof of an unwritten agreement and no *Brady* evidence to disclose.

Even if this isolated comment proved that a specific stipulation existed, that stipulation would not meet *Brady*'s materiality requirement because it is not "reasonab[ly] probabl[e], had the evidence been disclosed to the defense, that the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34. The information would not have helped Coker make a collateral estoppel argument because, as explained earlier, that doctrine does not apply in criminal cases. She says that it would have been useful to impeach Walsh, but the record shows that her counsel used a copy of Walsh's plea agreement to impeach Walsh at the sentencing hearing, and that Walsh freely admitted to cooperating with the government in order to get a lower sentence. This cross-examination rendered any undisclosed stipulation irrelevant and immaterial. *United States v. Soto-Beniquez*, 356 F.3d 1, 40 (1st Cir. 2003) (no *Brady* violation when details of plea agreement were not disclosed because cross-examination showed that witness was receiving favorable treatment from government in return for testimony); *United States v. Jones*, 160 F.3d 473, 479 (8th Cir. 1998) (holding that disclosure of plea agreement would not have led to different result because cross-examination showed that witness was receiving favorable treatment from the government).

3.     Calculation of Loss Amount

The PSR stated in paragraph 25 that the loss from the tape kickback scheme was $383,620, the amount the government overpaid for the tape, because the tape could have been purchased "by" other vendors for approximately $3.45 a roll. At the sentencing hearing, the government arguably relied on a different theory, the price at which the tape could have been purchased "from" other vendors. Walsh testified that he would have sold the tape to the government for between $3.40 and $3.50 a roll but for the kickback scheme. Coker considers Walsh's testimony an "eleventh-hour shift" in the government's calculation of loss theory and therefore prosecutorial misconduct. She speculates that, if she had known that the government would rely on Walsh's testimony, she could have shown that Walsh could not have sold the tape at that price and made a profit.

Coker relies on cases suggesting that the PSR works like a pretrial stipulation in a civil case and therefore the government cannot deviate from the PSR at the sentencing hearing. *See, e.g.*, *United States v. Butler*, 41 F.3d 1435, 1444 (11th Cir. 1995). These cases do not help her; they discuss only the *facts* contained in the PSR, not the theories by which the government seeks to prove those facts. *Butler* explains that the PSR "facilitates the identification of *factual* and *legal* issues that remain in dispute." *Ibid.* (emphasis added). Coker identifies no case holding that the government can prove a fact contained in the PSR only through the particular method identified in the PSR. If this argument were accepted, it would force prosecutors to oversee the details of every PSR and encourage them to cram the PSR with every possible theory on which the government might rely at sentencing. We decline to adopt such an impractical rule.

Furthermore, any "shift in the government's theory" could not have resulted in the "prejudice" necessary for prosecutorial misconduct. *Layne*, 192 F.3d at 579. As the government correctly points out, the PSR's use of "by" other vendors instead of "from" other vendors appears to be a clerical error. Logically, the price at which the tape could have been purchased *by* other vendors cannot be relevant to the loss calculation; what matters is how much the *government* would have had to pay to get the tape *from* other vendors. The very evidence Coker says the government prevented her from introducing, Walsh's costs of doing business, assumes that the PSR should read "from" other vendors because Walsh's costs are only relevant if the *government* is buying tape *from* Walsh. Likewise, the only evidence Coker introduced before the government allegedly changed its theory, an affidavit from the tape's manufacturer claiming that *he* would not have sold the *government* tape for $3.40 to $3.50 a roll, also assumes that the relevant price is the price at which the government could have bought the tape *from* other vendors. When Coker herself relies on theory to which the government "switched," any "switch," if it was impermissible, was not prejudicial.

## III

Coker also objects to the manner in which her sentence was calculated, and asserts that she suffered ineffective assistance of counsel. We decline to address the merits of either argument because she has withdrawn her ineffective assistance claim and waived her sentencing objections.

## A

In Coker's first brief, her trial counsel, who continues to represent her on appeal (with Coker's apparent approval), argued that his own performance at trial was constitutionally deficient. After the government pointed out that claims of ineffective assistance are not generally cognizable on direct appeal, but must be brought later under 28 U.S.C. § 2255, this claim was withdrawn. Therefore, we need not consider it further. *United States v. Quinlan*, 473 F.3d 273, 279 (6th Cir. 2007).

## B

Coker's plea agreement waived the right to appeal "the sentence imposed and the manner in which it was determined" unless the court "depart[ed] upwards" from the sentencing guidelines. Despite this provision, she complains that her sentence is too long.

A defendant may waive any right, including a constitutional right, in a plea agreement so long as the waiver is knowing and voluntary. *United States v. Calderon*, 388 F.3d 197, 199 (6th Cir. 2004). As mentioned previously, Coker does not claim that her plea agreement was involuntary or made in ignorance, nor could she given her discussion of the plea agreement with Judge Echols. We have repeatedly enforced plea agreements waiving specific appellate rights under similar circumstances, *United States v. Sharp*, 442 F.3d 946, 949, 952 (6th Cir. 2006); *United States v. McGilvery*, 403 F.3d 361, 363 (6th Cir. 2005) (holding a waiver valid and "strongly encouraging"

the government to file a motion to dismiss the appeal in similar future cases to avoid wasting time and resources), and we enforce the agreement before us today.

Contrary to Coker's accusation, the district court did not depart upwards and open the door to Coker's appeal. Rather, the court *adjusted* the base offence level for her illegal conflict of interest by finding that her other crimes were "relevant conduct." After adjustments, her final offense level was 23 and her guideline range was 46–57 months. Her sentence of 46 months is within—indeed, it is at the bottom of—the guideline range and thus not an appealable upward departure.

Despite Coker's attempt to conflate the two, "upward adjustments" (also known as "sentence enhancements") and "upward departures" are two different things. The *Guidelines Manual* explains that "adjustments" are applied first to calculate a defendant's guideline range, U.S.S.G. § 1B1.1(c), (e), while "departures" are given only at the end of the sentencing process and after all adjustments have been applied. *Id.* at § 1B1.1(i). An "upward departure" is "a sentence greater than a sentence that could be imposed under the applicable guidelines range," *id.* at § 1B1.1 comment (n.1), while "adjustments" are factored into the guidelines range. *Id.* at § 1B1.1(c). The *Guidelines Manual* discusses "adjustments" and "departures" in different sections and recognizes that grounds for granting one are not always grounds for granting the other. *Compare* U.S.S.G. § 3 (discussing "Adjustments") *with* U.S.S.G. § 5K (discussing "Departures").

Our court has previously differentiated between sentence adjustments (enhancements) and upward departures. *United States v. Roberts*, 64 F. App'x 473, 474 (6th Cir. 2003) (rejecting defendant's argument that he deserved a downward adjustment for acceptance of responsibility while upholding district judge's decision to depart upward based on defendant's criminal history); *United States v. Wright*, 119 F.3d 390, 393 (6th Cir. 1997) (holding that court did not abuse its discretion by departing upwards where upward adjustment did not adequately reflect defendant's torture of victim). At least three other courts of appeal have held that a defendant who waives the right to challenge her sentence unless the court "departs upward" cannot challenge the district court's calculation of sentence enhancements. *United States v. Fogg*, 409 F.3d 1022, 1025 (8th Cir. 2005) (holding appeal of enhancement under U.S.S.G. § 3A1.1(b) waived because it "was an 'adjustment' rather than an 'upward departure.'"); *United States v. Flint*, 156 F. App'x 252 (11th Cir. 2005) (holding that waiver of right to appeal sentence unless its was an upward departure barred appeal of sentence within guidelines range); *United States v. McMillion*, 151 F. App'x 693, 694 (10th Cir. 2005) (holding that "sentencing 'enhancements' and sentencing 'departures' are not synonymous" and that a "waiver for upward departures imposed by the court does not permit the challenging of sentence enhancements."). The Fifth Circuit declared an attempt to combine "adjustments" and "departures" frivolous and sanctioned counsel for making the same argument Coker is making. *United States v. Gaitan*, 171 F.3d 222, 224 (5th Cir. 1999) (per curiam).

We follow these decisions today and hold that by disputing the district court's sentence enhancements, Coker is appealing precisely what her plea agreement says that she cannot appeal. We further note that Coker cannot pretend to be surprised at the government's decision to enhance her sentence through relevant conduct. Her plea agreement states explicitly that there was "no agreement between the parties" as to whether her other crimes constitute relevant conduct. If she wanted to appeal the finding of relevant conduct, she could have, and should have, insisted on signing a different plea bargain. She did not; she signed a bargain waiving her right to appeal "the manner in which [her sentence] was determined." The government is entitled to the benefit of the plea bargain.

IV

No prosecutorial misconduct occurred at Coker's trial.  She has withdrawn her ineffective assistance claim and waived her sentencing claim.  We therefore affirm the district court's decision.